UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| LINDA SIMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 1:15CV45 ACL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Linda Simmons brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.   Simmons alleged that she was disabled because of orthopedic problems, severe arthritis in both knees and both ankles, bipolar disorder, breathing problems, and obesity.   (Tr. 207.)

An Administrative Law Judge (ALJ) found that, despite Simmons' severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

### I.  Procedural History

On September 8, 2011, Simmons filed applications for DIB and SSI, claiming that she

became unable to work due to her disabling condition on August 26, 2011.   (Tr. 178-79, 180-86).

Simmons' claims were denied initially.   (Tr. 110-20.)   Following an administrative hearing,

Simmons' claims were denied in a written opinion by an ALJ, dated November 8, 2013.   (Tr.

56-73.)   Simmons then filed a request for review of the ALJ's decision with the Appeals Council

of the Social Security Administration (SSA), which was denied on January 21, 2015.   (Tr. 1-5.)

Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§

404.981, 416.1481.

In the instant action, Simmons claims that the ALJ erred in determining her RFC.

## II.   The ALJ's Determination

The ALJ found that Simmons met the insured status requirements of the Social Security

Act through December 31, 2015, and that she has not engaged in substantial gainful activity since

August 26, 2011, her alleged onset date.   (Tr. 58.)

In addition, the ALJ concluded that Simmons' obesity, degenerative disc disease of the

lumbosacral spine and cervical spine, status-post arthroscopic surgery of the left knee, chronic

blood disorder requiring ongoing anti-coagulant medication, tobacco-related chronic obstructive

pulmonary disease, obstructive sleep apnea, Type II diabetes mellitus,[1] bipolar disorder, panic

disorder with agoraphobia, and post-traumatic stress disorder ("PTSD") were severe impairments.

(Tr. 59.)   The ALJ found that Simmons did not have an impairment or combination of

---

[1]Type II diabetes mellitus is caused by insulin resistance and characterized by symptoms of
increased thirst, frequent urination, and unexplained weight loss.   *Stedman's Medical Dictionary,*
529 (28th Ed. 2006).

impairments that meets or equals in severity the requirements of any impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

As to Simmons' RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that it also includes these nonexertional capabilities and limitations: no climbing of ropes, ladders or scaffolds; occasionally climbing ramps and stairs and balancing, stooping, kneeling, crouching, and crawling; not pushing and pulling with the left lower extremity more than occasionally; not having exposure to extreme heat or cold, unprotected heights, dangerous moving machinery, or whole body vibrations such as with operating heavy equipment or large trucks; doing simple, routine, repetitive tasks or ones not requiring more than infrequent changes in work settings or work processes; and not having close interaction with the general public or being exposed to crowds or having to do teamwork tasks. Sedentary work involves lifting or carrying no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools. Jobs are sedentary if walking and standing are required only occasionally (typically no more than 2 hours out of an 8-hour day) and all other sedentary criteria are met. 20 CFR 404.1567(a) and 416.967(a).

(Tr. 62.)

The ALJ found that Simmons' allegations regarding her limitations were not entirely

credible. (Tr. 64.) The ALJ discounted the opinions of treating psychiatrist Kishore Khot, M.D.

and consultative psychologist Georgette Johnson, Psy.D, finding they were inconsistent with the

medical evidence. (Tr. 69.)

The ALJ found that Simmons was unable to perform any past relevant work. (Tr. 70.)

There were other jobs (hand assembler, machine tender, and table worker), however, that exist in

significant numbers in the national economy that Simmons could perform. (Tr. 72.) The ALJ

therefore concluded that Simmons has not been under a disability, as defined in the Social Security

Act, from August 26, 2011, through the date of the decision.   *Id.*

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on September 7, 2011, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income protectively filed on September 14, 2011, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B.   Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any other kind of substantial gainful

work which exists … in significant numbers either in the region where such individual lives or in

several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security

Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First,

the Commissioner will consider a claimant's work activity.   If the claimant is engaged in

substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the claimant's

physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602,

605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that

would not significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to

do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work

setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291

(1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id.*   If a claimant retains the RFC to perform past relevant work, then the

claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§

404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## IV. Discussion

As noted above, Simmons argues that the ALJ erred in determining her RFC. Specifically, Simmons contends that the ALJ discounted the medical opinions of record and the remainder of the record does not support the ALJ's finding that Simmons can perform a limited range of sedentary work.

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), *Lauer v. Apfel,* 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir. 1995); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. *Id.; Hutsell v.*

*Massanari,* 259 F.3d 707, 711–12 (8th Cir. 2001); *Lauer,* 245 F.3d at 703–04; *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Hutsell,* 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant is able to perform certain functions. *Pearsall,* 274 F.3d at 1217 (8th Cir. 2001); *McKinney,* 228 F.3d at 863. The claimant bears the burden of establishing her RFC. *Goff,* 421 F.3d at 790.

In determining Simmons' RFC, the ALJ performed a credibility analysis and found that Simmons' complaints of disabling symptoms were not entirely credible. (Tr. 17.) Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005). Credibility questions are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart,* 349 F.3d 549, 558 (8th Cir. 2003).

### a. Physical RFC

The ALJ conducted a thorough examination of the objective medical evidence regarding Simmons' physical impairments and found that it did not support the severity alleged by Simmons. (Tr. 64-67.) The ALJ first discussed Simmons' knee impairment. (Tr. 64-65.) Simmons testified that she became disabled on August 26, 2011, because she underwent surgery on her left knee on that date. (Tr. 83.) The ALJ noted that Simmons first complained of knee pain on August 15, 2010, at which time she presented to the emergency room reporting pain resulting from a fall she sustained in a family altercation. (Tr. 64, 376.) X-rays revealed mild bilateral tricompartmental osteoarthritis. (Tr. 64, 378.) Simmons also complained of left knee pain to her primary care provider Charity Sandvos, M.D. in September 2010, October 2010, June 2011, and

July 2011.   (Tr. 298-312.)   Simmons saw orthopedic surgeon James Edwards on July 18, 2011.

(Tr. 385.)   Dr. Edwards diagnosed Simmons with bilateral knee pain, rule out meniscal tear on the

left side; and administered an injection.   (Tr. 386.)   On August 12, 2011, Dr. Edwards reported

that Simmons continued to have pain after the injection.   (Tr. 388.)   Dr. Edwards recommended

surgery.   *Id.*   On August 26, 2011, Dr. Edwards performed left knee arthroscopy, multi surface

chondroplasty with partial medial and lateral menisectomies.   (Tr. 369-70.)   On September 6,

2011, Dr. Edwards indicated that Simmons' incisions were healing adequately, and Simmons was

doing fairly well.   (Tr. 393.)   He stated that Simmons should stay off work for another four

weeks, after which she would hopefully begin progressing activities.   *Id.*   On September 22,

2011, Simmons continued to report some pain, most of it appearing to be global.   (Tr. 395.)

Upon examination, Simmons' incisions were healing well, and there was no warmth or erythema.

*Id.*   Dr. Edwards administered an injection to Simmons' left knee.   *Id.*   He recommended formal

physical therapy one to two times a week for four weeks and a home exercise program for range of

motion and strengthening.   *Id.*   Dr. Edwards stated that Simmons should remain off work at that

time and should follow up in four weeks.   *Id.*

The ALJ pointed out that there is no subsequent evidence indicating Simmons received

treatment for either knee, or that she saw Dr. Edwards again.   (Tr. 64.)   The ALJ further noted

that there is a gap in time from when Simmons last saw Dr. Edwards in September 2011 until her

next medical treatment in February 7, 2012.   It is true that significant gaps in treatment can

undermine a claimant's credibility.   *Mouser v. Astrue,* 545 F.3d 634, 638 (8th Cir. 2008).

On February 7, 2012, Simmons received emergency room attention, followed by a

three-day hospitalization, for a pulmonary embolism.[2]   (Tr. 501-20.)   Simmons had presented

---

[2]Obstruction of pulmonary arteries, most frequently by detached fragments of thrombus from a leg

with complaints of cough, chest discomfort, and wheezing.   (Tr. 501.)   It was noted that she had a history of hypertension and "factor v" blood disorder,[3] and deep vein thrombosis[4] for which she took Coumadin.[5]   *Id.*   Simmons was treated with medication.   (Tr. 519-20.)   As the ALJ noted, there was no recurrence of pulmonary embolism.   (Tr. 65.)

Simmons presented to Judith Hodits, a nurse practitioner, on February 14, 2012, to establish primary care.   (Tr. 472.)   Simmons complained of a cough and shortness of breath at that time.   *Id.*   Upon examination, Ms. Hodits noted no pain in Simmons muscles or joints, no limitations of range of motion, and no paresthesias or numbness.   *Id.*   Ms. Hodits administered nebulizer treatment, encouraged Simmons to quit smoking to prevent clots, and prescribed anticoagulants.   (Tr. 472-73.)   Simmons saw Ms. Hodits approximately monthly through May 2013, for treatment of various complaints, including cough, congestion, earache, dyspnea with exertion, low back pain, emotional problems, nausea, and vomiting.   (Tr. 446-71.)   Ms. Hodits managed Simmons' complaints with medication.   *Id.*   Ms. Hodits diagnosed Simmons with COPD with tobacco history on May 21, 2012.   (Tr. 468.)   She typically noted that Simmons had full range of motion of her extremities on examination.   (Tr. 450, 456, 458, 459, 461, 462, 464, 470.)   She occasionally noted back tenderness (Tr. 450, 456, 464.)   Ms. Hodits diagnosed type II diabetes mellitus on October 18, 2012, and started Simmons on medication and diet counseling.   (Tr. 461.)   On October 26, 2012, Ms. Hodits noted that Simmons had been caring for her eighteen-month-old grandson.   (Tr. 459.)   On November 9, 2012, Simmons reported an increase

---

or pelvic vein, commonly when thrombosis has followed an operation or confinement to bed. *Stedman's* at 627.
[3] An inherited disorder resulting in increased tendency to form blood clots and susceptibility to deep vein thrombosis and pulmonary embolism.   *See Stedman's* at 698.
[4] Formation of one or more thrombi in the deep veins, usually of the lower extremity or in the pelvis.   It carries a high risk of pulmonary embolism.   *Stedman's* at 1985.
[5] Coumadin is indicated for the treatment and prevention of blood clots.   *See* WebMD, http://www.webmd.com/drugs (last visited March 21, 2016).

in back pain since she had been caring full-time for her grandchild.   (Tr. 458.)   Ms. Hodits noted no abnormalities on examination.   *Id.*   She assessed lumbago,[6] and advised Simmons to stop lifting her grandchild from a standing position.   *Id.*   Simmons presented with her grandson on February 19, 2013.   (Tr. 454.)   Ms. Hodits noted no musculoskeletal abnormalities.   *Id.*   On April 2, 2013, Simmons say Ms. Hodits to have her ears checked and because she needed medication; Simmons' disability attorney also requested an assessment of her functional abilities. (Tr. 448.)   Ms. Hodits noted decreased range of motion of the low back at that time.   *Id.*   Ms. Hodits also diagnosed Simmons with sleep apnea.   *Id.*

Simmons received monthly treatment for pain, primarily back and neck pain, at Advanced Pain Clinic from December 28, 2012, through June 28, 2013.   (Tr. 597-633.)   On December 28, 2012, Simmons rated her back and neck pain as moderate to severe, and indicated that her pain interfered only with some daily activities.   (Tr. 628.)   Upon examination, Dr. Abdul N. Naushad noted tenderness but normal range of motion, and normal neuromuscular exam.   (Tr. 630.)   He diagnosed Simmons with spondylosis,[7] and intervertebral disc disorders of the lumbosacral and cervical spines.   *Id.*   Dr. Naushad prescribed narcotic pain medication, and recommended Simmons quit smoking, and start a home exercise program to reduce her weight.   (Tr. 631.) Physicians at Advanced Pain Clinic continued to note tenderness of the spine (Tr. 598, 604, 607, 611, 615, 618), as well as slightly reduced range of motion due to pain (Tr. 598, 604, 607, 611, 615, 618), but no significant neurological abnormalities.   On March 8, 2013, it was noted that Simmons had undergone an MRI, which revealed mild cervical stenosis[8] at C4-C7, a small disc herniation at C5-6, a moderate disc herniation at C6-7, and mild lumbar stenosis at L3-L5.   (Tr.

---

[6]Pain in the mid and lower back; a descriptive term not specifying cause.   *Stedman's* at 1121.
[7]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.   *Stedman's* at 1813.
[8]Narrowing of the spinal canal.   *Stedman's* at 1832.

615.)   At that time, Simmons reported that her medications were helping, and her pain was tolerable.   *Id.*   Simmons typically rated her pain as a 4 or 5 on a scale of 1 to 10.   (Tr. 603-627.)   On June 28, 2013, Simmons rated her pain as a 7.   (Tr. 597.)

Simmons presented to Musa Wadi, M.D., at Southeast Pulmonology, for an evaluation regarding COPD on February 21, 2013.   (Tr. 537-42.)   Simmons complained of symptoms including dry mouth, awakening with cough, wheezing, palpitations, lower extremity edema, and dyspnea with exertion.   (Tr. 537.)   She also reported hypersomnia.[9]   *Id.*   Simmons had smoked two packages of cigarettes a day for thirty years, but reported she was down to "a few" cigarettes a day.   *Id.*   Upon examination, Simmons was noted to be obese, with clear lungs, no cough, no edema of the extremities, and no abnormalities of the back or spine.   (Tr. 541.)   Dr. Wadi diagnosed Simmons with COPD, tobacco abuse, and hypersomnia.   *Id.*   Dr. Wadi recommended aerobic exercises, and weight reduction.   *Id.*   Simmons returned for follow-up on March 18, 2013, at which time Dr. Wadi indicated that tests to diagnose COPD were normal   (Tr. 533, 556.)   Dr. Wadi diagnosed Simmons with obstructive sleep apnea, and prescribed a C-PAP machine. (Tr. 535-36.)

Simmons saw nurse practitioner Pamela Kosterman for management of her diabetes on May 30, 2013.   (Tr. 475-80.)   Ms. Kosterman indicated that Simmons' type II diabetes was insulin requiring, and that her compliance with treatment had been "fair."   (Tr. 475.)   Simmons experienced episodes of hypoglycemia, but she was able to sense these episodes, which usually occurred early in the morning and were related to skipping a meal or overdosing on insulin.   *Id.* She had never lost consciousness.   *Id.* Ms. Kosterman provided diabetes education, and started Simmons on Vitamin D.   (Tr. 479.)   Finally, on June 12, 2013, Simmons presented to Stephanie

---

[9]A condition in which sleep periods are excessively long.   *Stedman's* at 926.

Danette Miller, M.D., to establish care and manage her Coumadin.   (Tr. 544.)   Simmons complained of urinary incontinence with coughing.   *Id.*

The ALJ noted that Ms. Hodits completed a Medical Source Statement-Physical submitted to her by Simmons' attorney on April 2, 2013, in which she expressed the opinion that Simmons could frequently and occasionally lift or carry less than five pounds; stand or walk continuously for less than fifteen minutes, and a total of less than one hour in an eight-hour workday; sit continuously for less than fifteen minutes, and sit a total of less than one hour in an eight-hour work day; can never climb, kneel, or crawl; can occasionally stoop and crouch; must avoid any exposure to extreme heat, dust/fumes, vibration, hazards, and heights; must avoid moderate exposure to extreme cold, weather, and wetness/humidity; and must lie down three to four times a day for periods of fifteen to twenty minutes.   (Tr. 66, 424-25.)   The ALJ stated that Ms. Hodit's opinions, provided on a check-off form, were inconsistent with her own treatment notes showing nearly all of Simmons' physical conditions to be controlled by medication.   (Tr. 66.)   The ALJ noted that Simmons' more serious conditions, such as the pulmonary embolism, were short in duration.   *Id.*   The ALJ concluded that the form was therefore not credible.   *Id.*

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians."   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)).   The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."   *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000). The record, though, should be "evaluated as a whole."   *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785–86 (8th Cir. 1997)).   The ALJ is not required to rely on one doctor's opinion

entirely or chose between the opinions. *Martise v. Astrue,* 641 F .3d 909, 927 (8th Cir. 2011).

Additionally, when a physician's records provide no elaboration and are "conclusory checkbox"

forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794

(8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the

weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ properly evaluated the opinion of Ms. Hodits. The controlling weight afforded

to a treating source medical opinion is reserved for the medical opinions of the claimant's

physician, psychologist, and other acceptable medical sources. *Tindell,* 444 F.3d at 1005. A

nurse practitioner's opinion is not an "acceptable medical source," but rather, is considered an

"other" medical opinion that the ALJ is to consider. *See Shontos v. Barnhart,* 328 F.3d 418, 426

(8th Cir. 2003). In this case, the ALJ considered Ms. Hodit's opinion and found that it was

inconsistent with her treatment notes. The ALJ accurately noted that Ms. Hodit's treatment notes

reveal that Simmons' chronic conditions responded to medication, and Simmons' acute

impairments were short in duration. In addition, Ms. Hodit noted few musculoskeletal

abnormalities on examination. Further, Ms. Hodit's opinion was provided in a check-list form

without evidence to support the opinions. Thus, the ALJ's decision to discredit Ms. Hodit's

opinion that Simmons has disabling limitations is supported by substantial evidence.

The ALJ next noted that no examining physician, including Drs. Sandvos or Edwards,

expressed the opinion that Simmons is permanently disabled or placed any long-term limitations

on Simmons' exertional or postural activities beyond the ALJ's RFC determination. (Tr. 67.)

This was a proper factor for the ALJ to consider. *See Young v. Apfel,* 221 F.3d 1065, 1069 (8th

Cir. 2000) ("We find it significant that no physician who examined [plaintiff] submitted a medical

conclusion that she is disabled and unable to perform any type of work.") (citing *Brown v. Chater,*

87 F.3d 963, 964–65 (8th Cir. 1996)). *See also Eichelberger,* 390 F.3d at 590 (ALJ could find claimant not credible based in part on fact that no physician imposed any work-related restrictions).

The ALJ noted that there is no evidence of significant, uncontrollable adverse side effects from medications Simmons takes. (Tr. 67.) The absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a claimant's complaints of disabling pain are credible. *See Depover v. Barnhart,* 349 F.3d 563, 566 (8th Cir. 2003). Additionally, Simmons reported that her medication regimen improved her pain, and routinely reported only a moderate pain level to her pain management physicians. (Tr. 603-27.)

The ALJ discussed Simmons' daily activities and stated that, to the extent they are restricted, they are restricted more by choice, as there is no evidence of pain diminishing Simmons' ability to concentrate. (Tr. 67.) For example, the ALJ noted that Simmons testified that she reads a lot and interacts with her grandchildren. (Tr. 91, 95.) In fact, Ms. Hodit's treatment notes contain several references to the fact that Simmons was a full-time caregiver to a very young grandson. (Tr. 454, 458, 459.) Significant daily activities may be inconsistent with claims of disabling pain. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

The ALJ stated that, despite having degenerative disc disease and some mild spinal stenosis, Simmons does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent muscle spasms, consistently reproducible neurological deficits, or inflammatory signs. (Tr. 67.) He also noted that Simmons did not require the use of an assistive device to stand or walk. *Id.* While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, *Jones v. Chater,* 86 F.3d 823, 826 (8th Cir. 1996), the absence of an objective

medical basis to support the degree of the claimant's subjective complaints is an important factor in evaluating the credibility of the claimant's testimony and complaints. *See Russell v. Sullivan,* 950 F.2d 542, 545 (8th Cir. 1991); *Edwards v. Sec'y of Health & Human Servs.,* 809 F.2d 506, 508 (8th Cir. 1987). The Court finds that the ALJ's consideration of the medical evidence upon discrediting Simmons' complaints of disabling pain is supported by substantial evidence and is consistent with the Regulations and case law.

The ALJ concluded that Simmons is unquestionably exertionally limited by her musculoskeletal disease, as well as by other physical impairments in combination, but there is no credible medical reason she cannot still perform at least sedentary work with the following additional limitations: no climbing of ropes, ladders or scaffolds; occasionally climbing ramps and stairs and balancing, stooping, kneeling, crouching, and crawling; no pushing and pulling with the left lower extremity more than occasionally; not having exposure to extreme heat or cold, unprotected heights, dangerous moving machinery, or whole body vibrations such as with operating heavy equipment or large trucks. (Tr. 62, 66.)

The undersigned finds that the ALJ's physical RFC determination is supported by substantial evidence in the record as a whole. Simmons contends that there is no medical evidence supporting the ALJ's RFC determination. The absence of opinion evidence does not undermine an ALJ's RFC determination where other medical evidence in the record supports the finding. *See Cox v. Astrue,* 495 F.3d 614, 619–20 (8th Cir. 2007); *see also Zeiler v. Barnhart,* 384 F.3d 932, 936 (8th Cir. 2004) (lack of opinion evidence not fatal to RFC determination where ALJ properly considered available medical and testimonial evidence). As previously noted, the ALJ was not required to rely entirely on a particular physician's opinion. *See Martise*, 641 F.3d at 927.

The ALJ's decision that Simmons retained the exertional ability to perform sedentary work is supported by the medical evidence cited by the ALJ, including Simmons' failure to receive treatment for her knees after September 2011, the limited musculoskeletal findings noted on examination, and Simmons' effective pain control with medication.   The ALJ's determination is also supported by Simmons' testimony regarding her daily activities, including her ability to care for her young grandson.   The ALJ included environmental restrictions to account for Simmons' COPD.   The record does not support any additional limitations resulting from Simmons' diabetes or other physical impairments.   The ALJ's determination is more restrictive than the opinion of the state agency physician, who found that Simmons could perform a range of light work.   (Tr. 410-15.)   Because the record contains some medical evidence that supports the RFC and substantial evidence on the record as a whole supports the determination, the ALJ did not err.

**b.   Mental RFC**

Simmons next argues that the ALJ erred in discounting the opinions of treating psychiatrist Dr. Kishore Knot, and consultative psychologist Dr. Georgette Johnson, and in not explaining the weight given to consultative psychologist Dr. Paul Rexroat when determining Simmons' mental RFC.

The ALJ discussed the evidence regarding Simmons' mental impairments.   (Tr. 67-68.) The ALJ noted that Simmons first complained of depression to Dr. Sandvos in April, 2010, prior to her alleged onset of disability date.   (Tr. 298.)   Dr. Sandvos prescribed an antidepressant drug, but Simmons reported that she was not taking it on September 3, 2010.   *Id.*   Simmons saw Reeta Rohatgi, M.D., at Community Counseling Center in October 2010, at which time she was diagnosed with bipolar I disorder,[10] major depression, and PTSD.   (Tr. 292.)   Dr. Rohatgi

---

[10] An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and

assessed a GAF score of 60-65, which the ALJ noted was indicative of only mild symptoms.[11]   *Id.*

Simmons saw Dr. Rohatgi for medication refills in October and November of 2010.   (Tr. 293-96.)

The ALJ noted that Simmons did not receive any more treatment for her mental impairments until

June 5, 2012.   (Tr. 67.)

On June 5, 2012, Simmons presented to Southeast Missouri Hospital due to complaints of

agitation or violent behavior.   (Tr. 483-96.)   Simmons reported that she was involved in two

different verbal and physical altercations with her husband the past two days after her husband

returned home drunk.   (Tr. 485.)   Simmons admitted to suicidal and homicidal ideation.   *Id.*

Simmons indicated that her primary care provider advised her to either turn herself in to the police

or present to the hospital for treatment.   *Id.*   Simmons reported a history of panic attacks and

bipolar disorder.   (Tr. 491.)   Simmons reported that she watched her grandchildren and used her

computer in her free time.   (Tr. 492.)   It was noted that Simmons was able to maintain her own

activities of daily living.   (Tr. 494.)   Simmons was discharged, and was advised to stay away

from her husband until he stopped drinking, and to follow-up with Ms. Hodits.   (Tr. 494-96.)

On June 21, 2012, Simmons presented to Community Counseling Center for a psychiatric

evaluation with Kishore Knot, M.D.   (Tr. 442.)   Simmons reported a history of depression and an

extensive history of physical and sexual abuse throughout her childhood.   (Tr. 443.)   Simmons

complained of irritability and symptoms of depression, including sad mood, crying spells,

decreased energy, and feelings of hopelessness.   *Id.*   Upon mental status examination, Simmons'

affect and mood appeared to be anxious and depressed, but she had no suicidal or homicidal

---

major depressive) episodes.  *See Stedman's* at 568.

[11]A GAF score of 61 to 70 denotes "some mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships."  *See American Psychiatric Ass'n., Diagnostic and Statistical Manual
of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV-TR*").

ideation, she was alert in all spheres, cooperative and communicative, she had normal speech, her thought processes were logical and organized, and she had no delusions or hallucinations. (Tr. 444.) Dr. Khot diagnosed Simmons with major depression and PTSD, and assessed a GAF score of 51.[12] *Id.* Dr. Khot started Simmons on Cymbalta[13] and Xanax,[14] and referred her to counseling. *Id.* Simmons continued to see Dr. Khot approximately monthly through May 2013. (Tr. 430-40.) On July 17, 2012, Simmons reported that the Cymbalta was helping her mood a little, but she was still experiencing problems controlling her temper around her alcoholic husband. (Tr. 440.) Simmons' affect and mood were anxious on examination. *Id.* Dr. Khot increased Simmons' dosages of Cymbalta and Xanax and prescribed Ambien[15] to help her sleep. *Id.*

Simmons presented to Georgette Johnson, Psy.D., at New Vision Counseling, on July 19, 2012, for a psychological evaluation. (Tr. 417-22.) Upon examination, Simmons was alert and oriented; there were no indications of psychosis or reality impairment; her speech was loud, slightly pressured, spontaneous, and goal-directed; her responses seemed open, honest, and direct; her personality was assertive, with a history of aggressive interactions, but she was friendly during her examination; her insight was good; her intellect appeared to be in the average range; she had a history of poor judgment at times, much of which seem associated with poor anger control during episodes of bipolar mania phases and as fueled by abusive relationships; her thinking was rational; and her memory for recent and remote events did not seem notably impaired. (Tr. 421.) Dr.

---

[12]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See DSM IV-TR* at 34.
[13]Cymbalta is indicated for the treatment of depression and anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited March 21, 2016).
[14]Xanax is indicated for the treatment of anxiety and panic disorders. *See* WebMD, http://www.webmd.com/drugs (last visited March 21, 2016).
[15]Ambien is indicated for the treatment of insomnia. *See* WebMD, http://www.webmd.com/drugs (last visited March 21, 2016).

Johnson diagnosed Simmons with bipolar I disorder, panic disorder with agoraphobia, PTSD, rule out intermittent explosive disorder, reported history of major depressive disorder, rule out personality disorder, and a GAF score of 47.[16]   (Tr. 422.)   She recommended that Simmons continue meeting regularly with her psychiatrist for medication monitoring, and meet regularly with her counselor.   *Id.*

Simmons saw Dr. Khot on August 20, 2012, at which time she reported that she was doing better with the increase of medications.   (Tr. 438.)   On August 30, 2012, Simmons reported that she had been crying for the past two days for no reason; she denied suicidal thoughts.   (Tr. 437.) Dr. Khot adjusted Simmons' medications.   *Id.*   On November 15, 2012, Simmons reported experiencing mood swings comprising periods of irritability and racing thoughts mixed with periods of depression.   (Tr. 434.)   Dr. Khot changed Simmons' diagnosis to bipolar disorder I and started her on Lithium.[17]   *Id.*   On December 12, 2012, Simmons reported that her mood swings had improved and she was feeling more level-headed and not losing her temper.   (Tr. 433.)   Simmons continued to report an improved mood on February 12, 2013.   (Tr. 431.)   On May 13, 2013, Dr. Khot stated that Simmons continued to be stable on medications, although she was in the process of getting divorced.   (Tr. 430.)   Simmons reported that she gets upset when her estranged husband comes over in a drunken state.   *Id.*   Dr. Khot stated that there are no reported side effects of Simmons' medications.   *Id.*   He noted that Simmons was applying for disability benefits.   *Id.*   On August 13, 2013, Simmons reported that she felt her medications had

---

[16]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM IV-TR* at 34.
[17]Lithium is indicated for the treatment of bipolar disorder.   *See* WebMD, http://www.webmd.com/drugs (last visited March 21, 2016).

helped her mood swings and she felt stable, not having had any major manic episodes. (Tr. 642.) Simmons' mood and affect were cheerful on examination. *Id.*

Simmons presented to Paul Rexroat, Ph.D. on September 25, 2013, for a psychological evaluation. (Tr. 649-53.) Upon examination, Simmons was adequately dressed and groomed, she was not anxious or weepy, she exhibited a normal range of emotional responsiveness and a normal affect, she had a normal energy level and was cooperative, her speech was normal and relevant, and there was no evidence of flight of ideas or loosening of associations. (Tr. 650.) Simmons reported frequent mood swings, nightmares, flashbacks about her past abuse, and difficulty getting close to other people. (Tr. 650-51.) She indicated that she does not want to get out of bed, bathe, or go out, and does few enjoyable things. (Tr. 651.) Simmons' memory was normal, and intelligence was in the average range. *Id.* Dr. Rexroat found that Simmons is able to understand and remember simple instructions, and sustain concentration and persistence with simple tasks. (Tr. 651-52.) He found that Simmons has some mild limitations in her ability to interact socially, as Simmons reported that she talks to her neighbor once or twice a week, usually gets along well with other people but does not like to be around crowds, and sees her daughter and son regularly. (Tr. 652.) Dr. Rexroat stated that Simmons has moderate limitations in her ability to adapt to her environment; and moderate limitations in her activities of daily living. (Tr. 652.) Dr. Rexroat diagnosed Simmons with bipolar II disorder,[18] panic disorder with agoraphobia, PTSD, and a GAF score of 51. *Id.* Dr. Rexroat also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he expressed the opinion that Simmons had moderate limitations in her ability to understand and remember complex instructions; carry out complex instructions; make judgments on complex work-related decisions; interact

---

[18]Bipolar disorder II is characterized by the occurrence of alternating hypomanic and major depressive episodes. *Stedman's* at 568.

appropriately with the pubic, supervisors, and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting.   (Tr. 645-46.)

Dr. Khot completed a Medical Source Statement-Mental on May 13, 2013, in which he expressed the opinion that Simmons was extremely limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, work in coordination with or proximity to others without being distracted by them, complete a normal workday without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number of and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors.   (Tr. 427-28.)   Dr. Khot found that Simmons was markedly limited in the following areas: ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.   *Id.*

The ALJ discussed Dr. Khot's opinion.   (Tr. 68.)   He acknowledged that the opinion of a treating physician or psychiatrist was entitled to great weight as long as it was supported and not inconsistent with other evidence.   (Tr. 68-69.)   The ALJ stated that he did not find Dr. Khot's assessment credible because it was inconsistent with the preponderance of the medical evidence, including Dr. Khot's own treatment notes.   (Tr. 69.)   The ALJ stated that Dr. Khot's treatment

notes reveal that Simmons' problems were either situational in nature or controlled with medication. *Id.* He pointed out that Dr. Khot's treatment notes from the day he authored his opinion indicate mild symptoms and good medication control. (Tr. 69, 430.) The ALJ stated that these treatments notes are contradictory to the extreme functional limitations Dr. Khot found on the form he filled out the same date. (Tr. 69.)

The undersigned agrees and finds that the ALJ provided sufficient reasons for discrediting Dr. Khot's opinion. Dr. Khot's treatment notes do not reveal the presence of extreme limitations. Rather, they indicate that Simmons' moods improved and she was stable on medication since Dr. Khot changed her medication in November 2012. (Tr. 433, 431, 430, 642.) In Dr. Khot's most recent treatment notes dated August 13, 2013, Simmons reported that she felt stable and had not had any major manic episodes; and her mood and affect were "cheerful" on examination. (Tr. 642.) Thus, the ALJ did not err in discrediting Dr. Khot's May 2013 opinion that Simmons had marked and extreme limitations in almost every area of functioning.

The ALJ next discussed the opinion of Dr. Johnson. (Tr. 69.) He similarly found that Dr. Johnson's opinion was not credible as it was inconsistent with the medical evidence, including Dr. Khot's records. *Id.* The ALJ further noted that Dr. Johnson examined Simmons only one time and, as such, is not a treating physician whose opinion is entitled to great weight. *Id.*

The ALJ did not err in discrediting Dr. Johnson's opinion. Dr. Johnson diagnosed Simmons with bipolar disorder, a panic disorder with agoraphobia, and PTSD, and assessed a GAF score of 47, which is indicative of serious symptoms and impairment. (Tr. 68, 417-22.) As previously discussed, Dr. Khot's records reveal that Simmons' medications were controlling her symptoms and she was stable. Dr. Johnson's own examination did not reveal serious symptoms. Rather, she indicated that Simmons was friendly, her personality was assertive, her

insight was good, her intellect was in the average range, her thinking was rational, and her memory did not seem impaired. (Tr. 421.)

Finally, Simmons contends that the ALJ erred in failing to indicate the weight he assigned to consultative psychologist Dr. Rexroat, and in formulating a mental RFC that differs from Dr. Rexroat's opinion. Specifically, Simmons argues that the ALJ failed to incorporate Dr. Rexroat's finding that Simmons had a moderate limitation in her ability to interact appropriately with supervisors.

The ALJ made the following determination regarding Simmons' mental RFC: limited to simple, routine, repetitive tasks or ones not requiring more than infrequent changes in work settings or work processes; and not having close interaction with the general public or being exposed to crowds, or having to do teamwork tasks. (Tr. 62.)

The ALJ summarized the findings of Dr. Rexroat, noting that Dr. Rexroat found that Simmons had moderate limitations in handling complex tasks, and in social interaction and work change adaptations, but mild or no limitations in all other mental functioning areas. (Tr. 68.) As Simmons points out, the ALJ did not indicate the weight he was assigning to Dr. Rexroat's opinions. (Tr. 68.)

Although the ALJ did not indicate the specific weight assigned to Dr. Rexroat's findings from his consultative examination, it is clear that he accorded them significant weight, as the ALJ's RFC determination is consistent with Dr. Rexroat's opinions. The ALJ's error in failing to expressly state the weight he gave to Dr. Rexroat's opinion is, therefore, harmless. *See Dunbar v. Colvin,* No. 1:13CV8 NAB, 2014 WL 319280, at *5 (E.D. Mo. Jan. 29, 2014) (finding arguable deficiency in opinion-writing technique is not a sufficient reason to set aside an administrative finding where the deficiency has no practical effect on the outcome of the case when the ALJ did

not explicitly provide the weight given to a doctor's opinion, because it was clear the ALJ gave some weight to the opinion).

As Simmons points out, the ALJ did not include a limitation regarding Simmons' ability to interact with supervisors despite Dr. Rexroat's finding that Simmons had a moderate limitation in this area.  (Tr. 652.)  Dr. Rexroat noted in his narrative report, however, that Simmons exhibited adequate social skills during the examination, and that she reported that she usually got along well with other people.  (Tr. 652.)  Dr. Rexroat stated that Simmons reported difficulty only with being around crowds.  *Id.*  This is consistent with Simmons' testimony at the administrative hearing, during which she reported difficulty being around crowds.  (Tr. 102-03.)  Further, the ALJ was not required to rely entirely on one doctor's opinion.   Thus, the ALJ did not err in failing to incorporate Dr. Rexroat's finding that Simmons is limited in her ability to interact with supervisors.

The mental RFC is supported by substantial evidence in the record as a whole.   The ALJ noted that Simmons did not begin her sustained course of treatment with Dr. Khot until June 2012, significantly after her alleged onset of disability date of August 26, 2011.  (Tr. 69.)   The ALJ noted that the reason Simmons stop working in August 2011 was not related to any mental impairment.  *Id.*   The ALJ pointed out that Simmons has not required any inpatient admissions for her mental impairments, and that her basic abilities to think, concentrate, get along with other people, make normal judgments and decisions, and adjust to routine work setting changes, and handle normal work stress have never been significantly impaired.  *Id.*   Dr. Khot's treatment notes reveal that Simmons' mental impairments were controlled with medication.   The ALJ included significant limitations consistent with Simmons' complaints of difficulty being around

crowds, Dr. Khot's treatment notes, and Dr. Rexroat's findings on examination and opinions. Thus, the ALJ did not err in determining Simmons' mental RFC.

After determining Simmons' RFC, the ALJ found that Simmons was unable to perform any past relevant work. (Tr. 70.) The ALJ properly relied on the testimony of a vocational expert to find that Simmons could perform other work existing in significant numbers in the national economy with her RFC, including sedentary and unskilled jobs of hand assembler, machine tender, and table worker. (Tr. 72, 106.) *See Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations). Thus, the ALJ's decision finding Simmons not disabled is supported by substantial evidence.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

Dated:  March 31, 2016

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE